UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

JANET MOKRIS,

       Plaintiff,

v.                       Case No:  2:20-cv-34-JES-MRM

UNITED STATES OF AMERICA,

       Defendant.

_____

## OPINION AND ORDER

This matter came before the Court from March 30 through April 1, 2022, for a bench trial.  In her Amended Complaint (Doc. #19), plaintiff Janet Mokris (Ms. Mokris) seeks monetary damages arising from a slip-and-fall incident at a United States Postal Service (USPS) location in Cape Coral, Florida.  (Doc. #19.)  Ms. Mokris asserts that as she was entering the post office she slipped and fell on water on the tile floor, injuring her left knee.  (Id. at ¶ 8.)

The Court heard testimony from Ms. Mokris, Greg Hammond, Christy Williams, Donna Graf, Albert (Randy) Vicedo, Dr. Victor Nemeth, William J. Fischer, Dr. Victor Michael Marwin, and Dr. Michael Shanhnasarian.  The Court also received a number of

exhibits[1] from both sides and heard opening statements and closing arguments from counsel.  Ms. Mokris seeks $7,247.40 in medical expenses, $1,318.99 in out-of-pocket expenses, $291,433.61 in non-economic damages, and $40,000 in lost wages, for a total of $340,000.  (Doc. #76, ¶ VII.)

At the conclusion of plaintiff's case, the Court took under advisement defendant's motion for a judgment on partial findings pursuant to Fed. R. Civ. P. 52(c).  The Court now denies defendant's Rule 52(c) motion.  As required by Fed. R. Civ. P. 52(a), the Court makes findings of fact and conclusions of law as set forth below as to the merits of the case.

## I.

### A.   Background

"Cape South" is a USPS retail facility located at 4722 SE 17th Avenue, Cape Coral, FL 33904.  Cape South is a smaller USPS branch and is under the supervision of another USPS location in Cape Coral (Cape Central).  There are usually two to three employees working at Cape South at a given time.

Built in 1967, Cape South has a single public entrance through sliding double doors which open automatically when approached. Immediately in front of the doors is a four to five foot-wide paved

---

[1] The parties' Joint Exhibits are identified as "Ex." Plaintiff's Exhibits are identified as "Pl. Ex."  Defendant's Exhibits are identified as "Def. Ex."

sidewalk which borders the threshold of the sliding doors on one side and a parking lot on the opposite side. (See Ex. 4.)  There is a shed-type roof overhang above the sliding doors which covers part, but not the entire width, of the sidewalk in front of the sliding doors. The roof overhang typically prevents water from accumulating on the tile floor inside the sliding doors.  The public may enter through these sliding doors 24 hours a day, seven days a week.

A person passing through the sliding doors enters the "entry lobby" area inside the building.  The floor of the entry lobby consists of 12-inch per side square tiles placed in a diamond pattern when viewed from the entrance.  Typically, a floor mat approximately three feet wide and the length of the doorway opening is located on the tiles of the entry lobby floor.  For safety reasons, post office personnel endeavor to keep this mat within approximately six inches of the threshold of the sliding doors, so that a person's first step into the building lands on the mat and not on bare tile.  There is a camera pointing at the entry lobby, however, that camera has not worked for approximately 10 to 15 years.

To the left of this entry lobby are post office boxes utilized by the public, which are accessible 24/7.  To the right of the entry lobby is the entrance to an inner lobby consisting of a retail and customer counter area.  The inner lobby is only open

during certain business hours.  In the inner lobby, there is a
live-feed, non-recording camera which surveys the customer
counter.  During closed hours, access to the inner lobby is
precluded by a locked, accordion-type door.

Donna Graf (Ms. Graf) started working for the USPS in 1981.
She worked at Cape South from 2001 to 2013 and 2017 to 2021, acting
as Lead Clerk for most of this time.  Ms. Graf's responsibilities
included ensuring that the USPS location ran smoothly and safely
while she was on-duty.  Ms. Graf testified that her general
practice was to conduct an inspection of the interior of Cape South
between five and 15 minutes before she opened the retail area to
the public.  During this inspection, which included the entry
lobby, Ms. Graf would look for any safety concerns, trash, or
material that needed to be removed.

In 2017, Christy Williams (Ms. Williams) became Acting
Supervisor of Cape Central, and in 2019 was promoted to Supervisor.
Ms. Williams has served as a facility safety coordinator and on a
safety committee for Cape Central.  In 2018, as Acting Supervisor,
Ms. Williams infrequently went to Cape South to provide assistance
or to conduct safety inspections.

**B.   The May 26, 2018 Fall**

May 26, 2018 (May 26) was a Saturday over Memorial Day
weekend.  During the night and morning hours, it had rained on and
off.  In the morning, it was wet outside.

4

On May 26, Ms. Graf arrived for work at Cape South between 7:00 and 7:30 a.m. and engaged in her various routine tasks. Ms. Graf knew it was rainy and wet that day, and testified that it had probably rained again between 7:00 a.m. and 10:00 a.m. Ms. Graf conducted her routine inspection of the entry lobby between 9:45 and the 10:00 a.m. opening of the inner lobby. Ms. Graf did not place a "wet floor" sign in the area because, while it had been raining, she did not notice any water on the floor. Ms. Graf did not know of any post office policy regarding when a "wet floor" sign should be posted.

Ms. Graf's specific testimony as to her observations during her routine inspection has varied over time. Ms. Graf prepared a Declaration used in connection with a summary judgment motion. (Pl. Ex. 2.) The Declaration stated that at approximately 10:00 a.m.: "I inspected the entrance area of Cape South, including the area adjoining the double doors leading to the exterior of Cape South. During my inspection, I did not observe any pooling of water at the entrance area." (Id.) The Declaration does not mention the location of the floor mat near the front sliding doors.

Ms. Graf testified on direct examination for defendant that she did not observe any pooling of water or anything else potentially dangerous near the sliding doors, and did not notice anything unusual about the placement of the mat. Ms. Graf explained that she would have noticed if the mat was more than six

inches from the door because the mats in Cape South often moved and she often found herself moving the mats back into their proper location.  Ms. Graf testified that she knew the placement of the mat was a safety issue, the aim being that a person's first step into the post office would land on the mat and not the tile floor.

Ms. Graf told defense counsel that the mat was in fact right by the sliding doors when she performed her morning inspection. Ms. Graf admitted that during her prior deposition she stated that she did not recall where the mat was located that morning.

In response to questions from the Court, Ms. Graf stated that she specifically remembers seeing the mat and its location on May 26, 2018.  Ms. Graf testified that she knows for certain that the floor mat was within four to six inches of the threshold of the sliding doors and the tile floor was not wet.  Ms. Graf had no explanation as to how the floor mat moved to the location depicted in the photographs taken after the Ms. Mokris' Fall, which is discussed in detail below. (Exs. 1-7.)

After Ms. Graf's routine inspection, Ms. Graf opened the inner lobby of the post office at about 10:00 a.m. to a line of waiting customers.  Ms. Graf testified that it was busy, which was usual for a Saturday morning.

This brings the Court to Ms. Mokris.  On May 26, Ms. Mokris was an active and fit 57-year-old woman who owned homes in Cleveland, Ohio and Cape Coral, Florida.  Around 10:00 a.m. Ms.

Mokris and Greg Hammond (Mr. Hammond), her long-time boyfriend, left the Cape Coral house and Mr. Hammond drove them to Cape South to drop off a letter. Ms. Mokris and Mr. Hammond arrived at Cape South between 10:10 a.m. and 10:15 a.m. While it had been raining earlier, it was not raining upon their arrival. Mr. Hammond parked his car about twenty feet from the post office doorway and waited in the car with the engine running. Ms. Mokris walked to the front entrance, pausing as necessary for the automatic doors to the entry lobby to slide open.

Ms. Mokris took a single step across the threshold of the sliding doors, stepped on wet tile, slipped, fell, and landed on her left knee, forearm, and palm. Mr. Hammond saw her go down very fast and hard on her left side. After a momentary delay because of his shock, Mr. Hammond entered Cape South to help Ms. Mokris, who was on the floor leaning against the doorway and complained of feeling nauseated, dizzy, and in great pain. Mr. Hammond helped Ms. Mokris move to a bench to sit down.

Ms. Mokris testified she was not looking down when she fell so she did not initially know what she slipped on. While sitting on the floor after the fall she could see a pool of water along the edge of the floor mat and a glazing of water on the tile, and felt a wet pant leg which had soaked up water from the floor after the fall. Ms. Mokris testified that if she had stepped on the

floor mat she would not have fallen, but the floor mat was too far
away from threshold of the sliding doors.

Mr. Hammond testified that the floor was wet and very
slippery, although he did not see a lot of water. Mr. Hammond
identified pooling of water along the edge of the floor mat, and
a little bit of water elsewhere on the tile, but no other pooling
of water. (Ex. 3.) Mr. Hammond testified that after the fall he
tested the tile with one foot on the sidewalk and found the tile
to be extremely slippery.

After the fall, Mr. Hammond went to get the attention of Ms.
Graf, who was assisting customers. Ms. Graf finished with her
current customer and went to speak with Ms. Mokris and Mr. Hammond.
Both declined emergency medical treatment for Ms. Mokris but
requested ice and that an incident report be completed. Ms. Graf
advised that she needed to call a supervisor at Cape Central. Ms.
Graf brought Ms. Mokris ice, called Cape Central and spoke to Ms.
Williams, and then went back to assisting a line of waiting
customers.

Within 10 minutes of the fall, Mr. Hammond took pictures of
the lobby entrance area with his cell phone. (See Exs. 1 through
6.) These pictures show that the floor mat was 16 to 18 inches
from the sliding doors. Ms. Mokris and Mr. Hammond both testified
that the mat was located as depicted in the photographs (Exs. 1-
7) and both said they never moved the mat. The mat was far enough

away from the door so that Ms. Mokris' first step landed on the tile, not the mat.

About 15 to 20 minutes after Ms. Graf's phone call, Ms. Williams arrived at Cape South. Ms. Williams spoke to Ms. Mokris and Mr. Hammond, who again declined medical attention. Ms. Williams testified that Ms. Mokris said she had been running to get out of the rain and slipped. Ms. Mokris denied making such a statement. Ms. Williams walked to the entry area and did not see any water on the floor. Ms. Williams took a picture of the entrance and a picture of Ms. Mokris' leg. (Ex. 7.) The photograph taken by Ms. Williams reflects that the floor mat was 16 to 18 inches from the sliding doors, and that someone put a "wet floor" sign on the floor mat, but not on the tile floor. Ms. Graf testified she did not put the "wet floor" sign out. Ms. Williams advised Ms. Mokris and Mr. Hammond of the location of an urgent care facility, and they both left Cape South.

Prior to Ms. Mokris fall, the USPS had received no prior reports of any slip and falls at Cape South.

On April 12, 2021, approximately three years after the fall, William J. Fischer (Mr. Fischer), plaintiff's expert licensed forensic civil engineer, performed a wet dynamic coefficient of friction test on two tiles in front of the sliding doors at Cape South. This test measures the ratio of force that it takes to push or slide an object across a given surface compared to its

weight.  The average ratio of eight tests run by Mr. Fischer was 0.4.  The American National Standards Institute (ANSI) standard for a wet tile floor at a business for areas expected to be walked upon when wet is 0.42 or higher.  In response to the Court's questioning, Mr. Fischer was unable to explain any real-world consequences of the 0.02 difference.

When Mr. Fischer arrived at the post office on April 12, 2021, the floor mat was 18 to 24 inches from the sliding doors.  Mr. Fischer examined some of the photographs taken by Mr. Hammond. Mr. Fischer opined that if the floor mat had been moved prior to the fall, he would expect the photographs to depict a uniform showing of water from the doorway to where the mat was moved, instead of just in a very small area adjacent to the mat, as depicted in the photographs. Mr. Fischer stated that with a recent movement you can usually see the shiny surface or some sort of water that is in the area from where the rug was displaced.

Ms. Williams believes the shoes Ms. Mokris was wearing may have contributed to the fall.  At trial, Ms. Williams testified how she often sends employees home for inappropriate footwear in her role as a Supervisor.  Ms. Williams contrasted Ms. Mokris' shoes to the shoes postal employees are required to wear, which include a thick tread on the bottom.

On May 26, Ms. Mokris wore "flip-flop" sandals.  (Ex. 8.) The bottoms of the flip-flops are black, squishy, and foam-like.

The tread on the sole is worn, although Ms. Mokris wore the shoes on a few occasions after the fall.  The top of the shoe, where the bottom of the foot would touch, is made of a hard, smooth plastic material which would be very slippery if wet.  The thong straps, which would hold one's foot in, are made of flexible plastic and loose.  Exhibit 8 is pictured below.

 

**C.   Ms. Mokris' Post-Fall Medical Treatment**

On May 26, Ms. Mokris went to a Lee Memorial Health System location complaining of knee pain.  (Ex. 9.)  The records indicate that Ms. Mokris' left knee exhibited "normal range of motion, no swelling, no effusion, no ecchymosis, no deformity, no laceration, no erythema, normal alignment, no LCL laxity, normal patellar mobility, no bony tenderness, normal meniscus and no MCL laxity.  No tenderness found."  (<u>Id.</u> p. LCC_000005.)  An X-ray of Ms. Mokris' knee also showed "no evidence of an acute fracture."  (<u>Id.</u> p. LCC_000006, LC_000018.)

Ms. Mokris returned to Ohio and began treating at the Cleveland Clinic with certified physician assistant Christopher Phillips, PA-C. (Ex. 10.) On June 13, 2018, PA-C Phillips noted Ms. Mokris' complaints of pain and ordered a "structured PT program 1-2x/week for 4-6 weeks." (Id. p. CCLINIC_000228.) On June 21, 2018, Ms. Mokris underwent a left knee MRI, which showed a horizontal tear in the posterior horn of the medial meniscus and a nondisplaced fracture of the proximal tibia. (Id. p. CCLINIC-_000228.) PA-C Phillips attributed plaintiff's pain to the meniscus tear and/or fracture tibia. Ms. Mokris attended 12 physical therapy sessions from June 13 through September 11, 2018 (about one per week). (Id. p. CCLINIC_000310.)

Because there was not a great deal of improvement, PA-C Phillips referred Ms. Mokris to Dr. Victor Nemeth, a board-certified orthopedic surgeon, who first saw Ms. Mokris on September 12, 2018. (Id. p. CCLINIC_000316.) During the first visit, Dr. Nemeth noted that Ms. Mokris' was complaining of pain in her left knee. Dr. Nemeth found the fracture had apparently healed (id. p. CCLINIC_000317), and treated her conservatively at first, prescribing an anti-inflammatory and scheduling another visit in a month. (Id.) In the meantime, Ms. Mokris continued physical therapy.

On October 17, 2018, Dr. Nemeth again saw Ms. Mokris. Dr. Nemeth found that Ms. Mokris had improved to some extent, but not

completely, so he ordered a repeat MRI to be sure the fracture was completely healed and not the source of her pain.  (Id. p. CCLINIC_000361.)  The repeat MRI showed that the fracture was completely resolved, leading Dr. Nemeth to believe the knee pain was being caused by the medial meniscus tear that remained. (Id. p. CCLINIC_000364-65.)  On November 7, 2018, Dr. Nemeth told Ms. Mokris that "she can live with this.  The other option would be to do an arthroscopy, meniscectomy, and shaving."  (Id. p. CCLINIC_000376.)

On January 16, 2019, Ms. Mokris underwent an arthroscopic partial meniscectomy of her left knee to remove the torn portion. Dr. Nemeth' operative notes state "[t]here was a degenerative tearing of the posterior horn of the medial meniscus," which he shaved and thinned back.  (Id. p. CCLINIC_000432.)  Dr. Nemeth also noted "a small dime-sized area of grade 3 chondromalacia[2] of the patella," which he shaved to a smooth base.  (Id.)

Ms. Mokris followed-up with Dr. Nemeth post-surgery on January 23 and February 27, 2019.  (Id. p. CCLINIC_000484-87.) Dr. Nemeth noted that her condition should continue to improve and she had 145-degree range of motion (which is considered normal). (Id.)  Dr. Nemeth also ordered physical therapy. (Id.)  From March

---

[2] Dr. Nemeth described chondromalacia as the softening of cartilage.

19 to April 24, 2019, Ms. Mokris attended six physical therapy sessions (about one per week) at the Cleveland Clinic. (Id. p. CCLINIC_000514.)  She continued physical therapy at The Metro Health System for nine visits between May 20 and August 27, 2019 (about one per 10 days). (Ex. 11.)

Dr. Nemeth did not see Ms. Mokris again for the next two years.  Ms. Mokris most recently saw Dr. Nemeth on June 9, 2021. She reported doing normal activities, but avoiding activities that put increased force on her left knee, such as dancing, ice skating, tennis, and squatting.  Ms. Mokris reported pain coming from the area of the knee under the kneecap where Dr. Nemeth had found the chondromalacia.  Dr. Nemeth felt this degenerative problem was not going to resolve but required no further treatment except for advice as to what activities to avoid and over the counter anti-inflammatory medicine to take as needed.  The tibia fracture had healed and caused no future problems.  Dr. Nemeth opined that the need for surgery and Ms. Mokris' pain was a direct result of the fall, since there were no symptoms prior to the fall.

**D.  Ms. Mokris' Work History**

Ms. Mokris earned her B.A. in business administration.  From 2004-2015, she worked as an accountant for Cuyahoga Community College, making approximately $40,000 per year.  In 2015, her position with Cuyahoga Community College was eliminated.  In August 2016, Ms. Mokris began working as an interim substitute teacher,

which she continued through May 2018.  In the fall of 2018, Ms. Mokris started working as a seasonal cashier clerk for JCPenny. From November 2019 through March 2020, Ms. Mokris worked as an accountant for Case Western Reserve University.  In the years surrounding the fall, Ms. Mokris' earned wages were: $10,098 in 2016 (Ex. 12); $5,657 in 2017 (Ex. 13); $8,588 in 2018 (Ex. 14); and $11,908 in 2019 (Ex. 15).

**II.**

The Court has jurisdiction over this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671.  Ms. Mokris exhausted her administrative remedies under the FTCA prior to filing suit.  (Doc. #76, ¶ IX(3).)

Ms. Mokris' FTCA claim sounds in negligence.  The Court applies Florida law to her claim because Florida is the place where Ms. Mokris' fall occurred.  28 U.S.C. § 1346(b)(1).  (See also Doc. #76, ¶ X(3).)  Under Florida law, to succeed on her negligence claim Ms. Mokris must prove the following four elements by a preponderance of the evidence: "(1) a duty by defendant to conform to a certain standard of conduct; (2) a breach by defendant of that duty; (3) a causal connection between the breach and injury to plaintiff; and (4) loss or damage to plaintiff." Encarnacion v. Lifemark Hosps. of Fla., 211 So. 3d 275, 277–78 (Fla. 3d DCA 2017) (quotation omitted).

**A.    Duties of Defendant**

"The determination of the existence of a duty of care in a negligence action is a question of law." <u>Goldberg v. Florida Power & Light Co.</u>, 899 So. 2d 1105, 1110 (Fla. 2005).  A party who has control over premises[3] owes an invitee the duties to (1) take ordinary and reasonable care to keep the premises in a reasonably safe condition, and (2) give timely warning of latent or concealed perils which are known or should be known to the party in control but are not known to the invitee or could not have been known to the invitee by the exercise of reasonable care.  <u>Norman v. DCI Biologicals Dunedin, LLC</u>, 301 So. 3d 425, 427 (Fla. 2d DCA 2020); <u>Contardi v. Fun Town, LLC</u>, 280 So. 3d 1114, 1116 (Fla. 5th DCA 2019); <u>Parker v. Shelman Prop. Owner's Association, Inc.</u>, 274 So. 3d 1219, 1221 (5th DCA 2019).

It is undisputed that defendant the United States of America, through the USPS, is the owner and has control of Cape South, and that Ms. Mokris was a business invitee.  Ms. Mokris has established the first element of her negligence claim.

**B.    Breach of A Duty**

Ms. Mokris alleged in her Amended Complaint (Doc. #19, ¶ 8), and testified at trial, that she slipped and fell on water on the

---

[3] <u>City of Naples v. Chops City Grill, Inc.</u>, 331 So. 3d 291, 293-94 (Fla. 2d DCA 2021).

tile floor as she entered Cape South. Florida law establishes
that water is a transitory foreign substance under the facts of
this case. Owens v. Publix Supermarkets, Inc., 802 So. 2d 315,
317 (Fla. 2001) ("By 'transitory foreign substance,' we refer
generally to any liquid or solid substance, item or object located
where it does not belong."). Where a business invitee slips and
falls on a "transitory substance" in a business establishment,
proof of the breach element has the added requirement imposed by
§ 768.0755 of the Florida Statutes. Encarnacion, 211 So. 3d at
278; see also Oliver v. Winn-Dixie Stores, Inc., 291 So. 3d 126,
128 (Fla. 4th DCA 2020). Fla. Stat. § 768.0755 provides:

> (1) If a person slips and falls on a transitory
> foreign substance in a business establishment,
> the injured person must prove that the
> business establishment had actual or
> constructive knowledge of the dangerous
> condition and should have taken action to
> remedy it. Constructive knowledge may be
> proven by circumstantial evidence showing
> that:
>
> (a) The dangerous condition existed for such
> a length of time that, in the exercise of
> ordinary care, the business establishment
> should have known of the condition; or
>
> (b) The condition occurred with regularity and
> was therefore foreseeable.
>
> (2) This section does not affect any common-
> law duty of care owed by a person or entity in
> possession or control of a business premises.

Thus, "a jury cannot find liability in a case involving 'transitory
foreign substances in a business establishment' unless it finds

that the business establishment had actual or constructive notice." N. Lauderdale Supermarket, Inc. v. Puentes, 332 So. 3d 526, 531 (Fla. 4th DCA 2021). "To prove constructive knowledge, the plaintiff must prove either "(a) [t]he dangerous condition existed for such a length of time that, in the exercise of ordinary care, the business establishment should have known of the condition; or (b) [t]he condition occurred with regularity and was therefore foreseeable." Greeley v. Wal-Mart Stores East, L.P., 2022 WL 1019619, at *4 (Fla. 2d DCA Apr. 6, 2022) (quoting Fla. Stat. § 768.0755).

Thus, Ms. Mokris must prove by a preponderance of the evidence that there was a dangerous condition, that defendant had actual or constructive notice of the dangerous condition, and that defendant should have taken action to remedy it. The Court finds that Ms. Mokris has satisfied her burden, and has therefore established the second element of her negligence claim.

Contrary to defendant's argument, the Court finds that the credible evidence establishes the existence of a dangerous condition on May 26. At the time Ms. Mokris entered the post office building, the floor mat was 16 to 18 inches from the threshold of the sliding doors, leaving the relevant floor tiles uncovered. The floor tiles between the door opening and the mat were wet from customers tracking water from the wet surfaces

outside into the building.[4]   Despite rain and wet conditions
outside, there was no "wet floor" or other warning sign posted in
the area.  The reasonably anticipated slickness caused by customers
tracking rainwater into the building, coupled with the misplaced
mat and the lack of any notice signage, constituted a dangerous
condition.[5]

The Court next finds that the credible evidence establishes
that defendant had at least constructive knowledge of this
dangerous condition.  The Court rejects Ms. Graf's testimony that
the floor mat was in the proper position when she made her
inspection.  The photos taken immediately after the incident show
the mat was over 16 inches from the threshold of the sliding doors.
As Mr. Fischer testified, the physical evidence in the photographs
suggests that at most the mat may have moved a couple inches.  This
distance is consistent with movement created by customers entering
and wiping their feet on the mat on a busy Saturday morning.  But

---

[4] Ms. Graf testified it was a busy customer morning, and
defendant explicitly recognizes this source of water on the tile,
although it blames just plaintiff for tracking in waster.  (See
Doc. #20, p. 2 ¶ 8.)

[5] During closing argument plaintiff's counsel asserted that
the USPS' broken camera, the small size of the overhang outside
the sliding doors, the lack of a mat outside the entrance, and the
lack of the inside mat being screwed to the floor were all a basis
for plaintiff's negligence claim.  The Court finds that none of
these conditions constituted part of a dangerous condition or
contributed to the cause of any injury to plaintiff.

a couple inches of mat movement does not explain nearly a foot of mat movement.  Ms. Graf also knew that the mat was a problem since she constantly found herself moving the mats in Cape South to the correct position.  Thus, given the wet weather outside, Ms. Graf simply did not observe what was there – a misplaced mat and resulting wet and slippery tiles.  Defendant should have known of the dangerous condition at Cape South on May 26.

Finally, the Court finds that defendant should have remedied this dangerous condition.  Common sense would indicate water on tiles makes them inordinately slippery, and that the tiles should have been dried, the mat repositioned, or at the very least the wet floor sign placed out as a warning.  Leaving water on tile, not placing the floor mat in the proper location, and failing to place a wet floor sign by the wet tile created a dangerous condition that cannot be left uncorrected in a building which invites the public to enter.

In all, a dangerous condition existed, defendant should have known about it, and defendant should have remedied it.  Defendant breached its duty to Ms. Mokris by failing to take ordinary and reasonable care to keep its floor safe.  The Court concludes that Ms. Mokris has proven the second element of her negligence claim by a preponderance of the evidence.

**C.    Causal Connection**

For the third element, Ms. Mokris must prove by a preponderance of that defendant's breach of duty was the legal cause of her injuries. <u>Encarnacion</u>, 211 So. 3d at 277-78. "In negligence actions Florida courts follow the more likely than not standard of causation and require proof that the negligence probably caused the plaintiff's injury." <u>Gooding v. Univ. Hosp. Bldg., Inc.</u>, 445 So. 2d 1015, 1018 (Fla. 1984). The Court must therefore determine whether defendant's negligent conduct probably caused Ms. Mokris' knee injuries. The Court concludes that the preponderance of the evidence establishes that the USPS' negligent conduct caused two of the three asserted knee injuries.

At trial, Ms. Mokris identified three different knee injuries which she contends were caused by her fall: (1) a fracture of the proximal tibia; (2) a nondisplaced tear of the medial meniscus; and (3) chondromalacia. Plaintiff presented the testimony of her treating orthopedic surgeon, Dr. Nemeth, in support of her claimed injuries. Defendant argues that the injuries were not caused by the fall, and presented testimony from Dr. Marwin in support.

Ms. Mokris' fracture was occult (hidden), not visible on an X-ray, and only visible on sensitive MRI imaging. There is no evidence that Ms. Mokris injured her knee either before the fall or after her fall and before her first MRI. The credible evidence

establishes that her fracture was more likely than not caused by her fall.

Dr. Nemeth noted in his post-operative report that Ms. Mokris' medial meniscus tear was degenerative in nature. Dr. Nemeth also opined that the injury which required surgery was the direct result of the fall. The credible evidence establishes that her medial meniscus tear was more likely than not caused by her fall.

Dr. Nemeth discovered the chondromalacia under her patella - a softening of cartilage, sometimes used as a synonym for arthritis - during his medial meniscus surgery. Dr. Nemeth conceded that this could be caused by plaintiff's age. Dr. Marwin explained that Ms. Mokris' chondromalacia under her patella was in a completely different anatomic location from Ms. Mokris' tibial fracture and that the Ms. Mokris' cartilage at the site of the fracture was normal. These medical opinions suggest that Ms. Mokris' chondromalacia was more likely caused by her age and not by her fall.

Ms. Mokris has proven that her fall probably caused her fracture and medial meniscus tear, but not her chondromalacia. To this extent, the Court concludes that Ms. Mokris has proven the third element of her negligence claim by a preponderance of the evidence.

D.   **Comparative Negligence**

Defendant asserts that the cause of the fall was Ms. Mokris' own negligence in the choice of her footwear.  This comparative negligence, defendant asserts, bars or limits any recovery by Ms. Mokris.  (Doc. #29, p. 4 ¶2.)

"Comparative negligence is an affirmative defense; thus, the party asserting the defense bears the burden of proving that the negligence of the other party was a cause of the accident." Bongiorno v. Americorp, Inc., 159 So. 3d 1027, 1029 (Fla. 5th DCA 2015).  As with any negligence claim, the proponent must prove the four elements of duty, breach, causation, and damages.  Id.  Here, defendant has not established either the duty or the causation elements, and therefore does not prevail on its comparative negligence defense.

The only possible source of a duty in this case is one arising from the general facts of the case.[6]

> The determination of whether a duty arises from the general facts of the case depends upon an evaluation and application of the concept of foreseeability of harm to the circumstances alleged. "To determine whether a duty sufficient to support a negligence claim exists, one begins by determining

---

[6] "A duty of care arises from four potential sources: (1) legislative enactments; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; or (4) a duty arising from the general facts of the case." Bongiorno, 159 So. 3d at 1029 (citing Dorsey v. Reider, 139 So.3d 860, 863-64 (Fla. 2014).

> whether the defendant by its conduct created a foreseeable zone of risk." <u>ZP No. 54 Ltd. P'ship v. Fidelity & Deposit Co. of Md.</u>, 917 So.2d 368, 374 (Fla. 5th DCA 2005). "[A] foreseeable consequence is one that a prudent person would anticipate as likely to result from an act." <u>Land Title of Cent. Fla., LLC v. Jimenez</u>, 946 So.2d 90, 93 (Fla. 5th DCA 2006).

<u>Id.</u> "'To impose a duty, it is not enough that a risk merely exists or that a particular risk is foreseeable; rather, [Ms. Mokris'] conduct must *create* or *control* the risk before liability may be imposed.'" <u>Jackson Hewitt, Inc. v. Kaman</u>, 100 So.3d 19, 28 (Fla. 2d DCA 2011) (quoting <u>Demelus v. King Motor Co. of Fort Lauderdale</u>, 24 So.3d 759, 761 (Fla. 4th DCA 2009)) (emphasis in original).

The Court finds that defendant failed to carry its burden of proving Ms. Mokris created a foreseeable zone of risk by wearing flip-flop sandals on a rainy day to go to the post office or that the sandals were the cause of the fall. While a wiser choice of footwear was certainly possible, there was no credible evidence that wearing these flip-flops created the required foreseeable zone of risk. Wearing flip-flop sandals in Florida is common. Although USPS employees may be required to wear specific footwear, nothing about Cape South, a normal post office, suggests that business invitees are required to wear specific footwear. Examination of the Ms. Mokris' sandals (Ex. 8) does not reveal any outstanding characteristic which convinces the Court that the sandals were inappropriate in general or contributed to her fall.

While the record reflects that a portion of one of the sandals was cut away for testing, there was no evidence of any testing results, and therefore no credible evidence that the footwear was inappropriate on a rainy day.  The Court finds that defendant has not satisfied its burden of proof to establish comparative negligence.  E.g., Bongiorno, 159 So. 3d 1029 (employee who wore four to five inch high heels to work and slipped in water was not comparatively negligent).

### E.    Damages

For the fourth element, Ms. Mokris must prove damages.  Ms. Mokris claims damages for medical expenses, out-of-pocket expenses, lost wages, and non-economic damages.   The Court discusses each in turn.

#### (1)   Medical Expenses

Ms. Mokris claims $7,247.40 in medical expenses and that amount is undisputed.  (Doc. #76, ¶¶ VII, IX(4).)  The Court previously concluded that the fractured tibia and medial meniscus tear were caused by her fall.  The Court concludes that Ms. Mokris has proven by a preponderance of the evidence her damages for medical expenses in the amount of $7,247.40.

#### (2)   Out-of-Pocket Expenses

Ms. Mokris argues that she suffered $1,318.99 in out-of-pocket expenses that were caused by her fall at Cape South.  (Doc. #76, ¶ VII.)  At the bench trial, Ms. Mokris presented no evidence

of out-of-pocket expenses.  Accordingly, the Court concludes that Ms. Mokris has not proven by a preponderance of the evidence that she is entitled to out-of-pocket expense damages.

**(3) Lost Wages**

In her papers and during closing argument, Ms. Mokris argued that she suffered $40,000 in lost wages.  (Doc. #76, ¶ VII.)  At trial, Ms. Mokris testified that she believed her lost wages were approximately $50,000.  The Court finds that Ms. Mokris has not proven any amount of lost wages.

The quantitative evidence fails to demonstrate that Ms. Mokris' income was impacted by her fall.  Her earned wages, salaries, and tips in 2018 and 2019 – the years she asserts her work was affected by the fall – were $8,588 and $11,908, respectively.  In 2017, she earned $5,657.  Thus, Ms. Mokris made more money in the year during and year after her fall than in the previous year.

The qualitative evidence tells a similar story.  From August 2016 through May 2018, Ms. Mokris worked as a substitute teacher. Ms. Mokris fell on Saturday, May 26, 2018 and her school system's last day for the summer was June 6, 2018.  (Ex. 18.)  Her school system resumed between August 20-22, 2018. (Id.) Ms. Mokris presented no evidence at trial that she had to decline substitute teaching work during the end of the school year or the start of

the new year.   There was no evidence she lost any substitute teaching wages.

Ms. Mokris instead asserted that she suffered lost wages because she was unable to seek out accounting work for an entire year after the fall.  She testified at trial that she believed no employer would hire her when she needed to take time off for medical treatment.  But in May 2018, Ms. Mokris had not worked as an accountant for three years.  Ms. Mokris also had no recollection of interviewing with any potential employers for an accounting position during the three years preceding her fall.   While Ms. Mokris was undergoing medical treatment, her treatment did not consume significant time – she only had a handful of doctor's appointments related to her knee during her year of treatment and, on average, she attended one physical therapy session per week. Finally, Ms. Mokris gained employment shortly after her fall as a seasonal cashier for JCPenny.  The Court, therefore, is unpersuaded that Ms. Mokris' inability to gain (or seek out) accounting work was caused by her fall.

Accordingly, the Court concludes that Ms. Mokris has not proven by a preponderance of the evidence that she is entitled to damages for lost wages.

**(4)  Non-Economic Injuries**

Ms. Mokris requests $291,433.61 in non-economic damages based on pain and suffering and loss of enjoyment of life.  (Doc. #76,

¶ VII.)  The extent of Ms. Mokris' request is not supported by the evidence.

The evidence shows that Ms. Mokris suffered pain during and after the accident, which was by caused her fracture and medial meniscus tear.  The Court concludes that Ms. Mokris has shown a basis for damages due to past pain and suffering.  For future damages, Ms. Mokris walks without any issues and functions in all day-to-day activities normally, but she is limited in some of the more active hobbies that she enjoyed prior to the fall, such as dancing and ice skating.  Thus, given the facts of this case and Ms. Mokris' proven damages, the Court finds that $50,000 is a reasonable amount for past and future noneconomic damages.

### IV.

The Court concludes that Ms. Mokris carried her burden and has proven all four elements of her negligence claim by a preponderance of the evidence.  Judgement will be entered in favor of Ms. Mokris on her Amended Complaint.  (Doc. #19.)

Ms. Mokris has proven the following damages: $7,247.40 in medical expenses and $50,00.00 in noneconomic damages, totaling of $57,247.40.  The Court also concludes that defendant has not carried its burden as to comparative negligence.

Accordingly, it is now

**ORDERED:**

1.    Judgement shall be entered in favor of Ms. Mokris on the
      Amended Complaint.   (Doc. #19.)

2.    The Court awards Ms. Mokris $57,247.40.

3.    The Clerk shall enter judgment accordingly and close the
      case.

**DONE and ORDERED** at Fort Myers, Florida, this ___2nd___ day of

May, 2022.


                                        JOHN E. STEELE
                                        SENIOR UNITED STATES DISTRICT JUDGE


Copies:
Counsel of Record